UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
———————————————————X

KATHERINE G. RAPINE, derivatively on
behalf of ASPEN TECHNOLOGY, INC.,

     Plaintiff(s),

 vs.

JOAN C. MCARDLE, DOUGLAS A.
KINGSLEY, DONALD P. CASEY, MARK E.
FUSCO, GARY E. HAROIAN, STEPHEN M.
JENNINGS, MICHAEL PEHL, STEVEN L.
BROWN, GRESHAM T. BREBACH, JR.,
DOUGLAS R. BROWN, CHARLES F. KANE,
MANOLIS E. KOTZABASKIS, C. STEVEN
PRINGLE, DAVID MCQUILLIN,
LAWRENCE B. EVANS, STEPHEN J.
DOYLE, LISA W. ZAPPALA, and MAY A.
PALERMO,

   - and -

ASPEN TECHNOLOGY, INC., a Delaware
Corporation,
    Nominal Defendant,

    Defendant(s),
———————————————————X

06-CA-11879 RGS

**AMENDED VERIFIED
SHAREHOLDER DERIVATIVE
COMPLAINT**

  Katherine G. Rapine ("Plaintiff") is a shareholder of Aspen Technology Inc. ("Aspen" or the "Company"), and files this Verified Shareholder Derivative Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 23.1 on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of the law, including breaches of fiduciary duties relating to events that began as early as January 1, 1996 and continued until September 28, 2006, inclusive (the "Relevant Period") and that have caused substantial financial losses to Aspen and other damages, including, but not limited to, its reputation and goodwill.

Plaintiff hereby alleges upon personal knowledge as to her own acts and upon information and belief as to all other matters, based upon, *inter alia*, an investigation conducted by her counsel, which included, among other things, the review of publicly available documents filed with the United States Securities and Exchange Commission ("SEC"), press releases and other media reports.

## **INTRODUCTION**

1. A stock option is a grant, usually to executive officers or directors of a corporation, that allows the officer or director to purchase company stock at a specified price - referred to as the "exercise price" or "strike price"- for a specified period of time. Stock options are sometimes granted as part of executive compensation packages purportedly to create incentives for them to boost profitability and stock value, but also as a way to compensate them without the company having to expend substantial cash. Stock option compensation became much more popular among "start-up" and technology companies, than companies in other lines of business. An employee "exercises" an option, by purchasing the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised.

2. The exercise price is usually the price of the Company stock on the day of the grant. In a practice called "backdating," whomever is responsible for awarding the options retroactively selects a date on which the stock price was below the current market price. When an option is backdated to a day on which a market price was lower than the price on the day the option is actually granted, the employee pays less and the company gets less money for the stock when the option is exercised. Furthermore, the purchaser of the option gets an "in-the-money" option resulting in greater compensation than that to which he or she is entitled.

3. Prior to the Sarbanes-Oxley Act, which was signed into law on July 30, 2002 ("SOX"), companies required to file periodic reports with the SEC did not have to immediately report their stock option grants. In a provision of SOX, the SEC shortened the time companies have to report insider transactions, including grants of stock options, to two days, which had the potential effect of curtailing the ability to backdate.

4. During the Spring of 2006, media reports began to surface about instances of illegal backdating at certain technology companies. For example, on May 19, 2006, The *Wall Street Journal* published an analysis of stock options granted to chief executive officers of half a dozen companies in an article titled, "U.S. INTENSIFIES STOCK OPTIONS PROBE: Subpoenas by Prosecutors in Manhattan Office Signal Major Step-up in Scrutiny." The subject matter of this article, and numerous others in the subsequent days and months, was the illegal backdating of stock option grants to senior officers and directors of many corporations.

5. On May 23, 2006, SEC Chairman Christopher Cox was widely quoted as saying that possible stock option backdating is "a matter of ongoing interest to our enforcement division."

6. One month later, on June 22, 2006, Mr. Cox stated that stock option backdating may be even more widespread than initially thought, and may have continued even after SOX took effect in 2002.

7. A statistical analysis released on July 15, 2006 indicated that more than 2,000 U.S. companies might have manipulated the timing of stock-option grants to executives between 1996 and 2005.

8. On July 17, 2006, the *New York Times* published an analysis of the study released by Professors Erik Lie of the Tipple College of Business at the University of Iowa and Randall

A. Heron of the Kelley School of Business at Indiana University in an article titled "STUDY FINDS BACKDATING OF OPTIONS WIDESPREAD." Lie and Heron examined 39,888 stock option grants to top executives at 7,774 companies dated form January 1, 1996 to December 1, 2005. The study estimated that 29.2% of the companies examined had manipulated stock option grants at some point during the period. Lie stated "[T]his is not random chance. It's something that's manipulated, clearly."

9. According to a *New York Times* article on July 13, 2006, entitled "Prosecutor Forms Task Force To Probe Stock-Options Grants," Kevin Ryan, U.S. Attorney for the Northern District of California, launched a task force focused on stock-options backdating by companies. Ryan was quoted as stating that backdating "is an issue that needs to be investigated aggressively" and could "constitute fraud on the company, shareholders and the market, and may give rise to tax violations." The article stated that "Federal prosecutors in New York, Massachusetts and elsewhere are also conducting criminal stock-option-timing investigations, while the SEC focuses on potential civil violations."

10. On July 20, Federal Prosecutors in the Northern District of California filed the country's first criminal charges against executives for securities fraud in conjunction with a related civil suit filed by the SEC. Both agencies indicated that many more executives could face charges related to the manipulating of stock options. Ryan stated that the U.S. Attorney for the Northern District of California is looking "'strongly, intently and aggressively' at possibly fraudulent backdating of options at several Bay Area companies." Linda Chatham Thomsen, director of enforcement at the SEC warned that "this case will not be the last... More are to come." And Christopher Cox stated that "[t]he Securities and Exchange Commission is committed to bringing [options backdating] to an end nationwide."

11. Defendants' conduct complained of herein is just the type of illegal back-dating Federal prosecutors and the SEC have been investigating and prosecuting. From 1997 to 2001, defendants were granted hundreds of thousands of backdated or otherwise manipulated options to purchase Aspen stock. Defendants backdating of options violated Aspen's shareholder-approved stock option plans. Defendants backdating of options also breached their fiduciary duties of care, loyalty, and good faith to Aspen.

12. The unlawful conduct occurred while Defendants were managing the Company. These Defendants authorized, modified, or failed to halt back-dating of options in dereliction of their fiduciary duties to the Company as directors and officers, thus causing or allowing the Company to suffer millions of dollars in harm.

13. Defendants' conduct has unjustly enriched certain of Aspen's executives to the detriment of Aspen and its shareholders.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including SOX. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) insofar as a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## THE PARTIES

16. Plaintiff Katherine G. Rapine, is, and was at times relevant hereto, an owner and holder of Aspen common stock. Plaintiff Rapine is a citizen of Pennsylvania.

17. Nominal Defendant Aspen is a corporation organized and existing under the laws of Delaware, with its headquarters located in this District at Ten Canal Park, Cambridge, Massachusetts 02141-2201.

### Director Defendants

18. Defendant Joan C. McArdle ("McArdle") has served on Aspen's board of directors (the "Board") since 1994. Defendant McArdle also serves on the Board's Audit Committee (the "Audit Committee") as well as the Nominating and Corporate Governance Committee. Defendant McArdle knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, McArdle held 134,298 options to purchase Aspen stock.

19. Defendant Douglas A. Kingsley ("Kingsley") served on the Board from August 2003 through January 2006. Defendant Kingsley knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to

him in connection therewith. As of October 1, 2003, Kingsley held 4,432,790 options to purchase Aspen stock.

20. Defendant Donald P. Casey ("Casey") has served on the Board since April 2004. Defendant Casey also serves on the Audit Committee, the Compensation Committee (the "Compensation Committee"), and the Nominating and Corporate Governance Committee. Defendant Casey knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, Casey held 19,000 options to purchase Aspen stock.

21. Defendant Mark E. Fusco ("Fusco") has served on the Board since December 2003, and has served as the Company's President and Chief Executive Officer ("CEO") since January 2005. Defendant Fusco was a member of the Compensation and Nominating and Corporate Governance Committees in 2004. Defendant Fusco knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, Fusco held 589,000 options to purchase Aspen stock.

22. Defendant Gary E. Haroian ("Haroian") has served on the Board since December 2003. He also serves on the Audit and Nominating and Corporate Governance Committees.

Defendant Haroian has been determined to be an "audit committee financial expert," as defined in Item 401(h) of Regulation S-K. Defendant Haroian knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, Haroian held 23,000 options to purchase Aspen stock.

23. Defendant Stephen M. Jennings ("Jennings") has served on the Board since July 2000, and has served as Chairman of the Board since January 2005. Defendant Jennings also serves on the Compensation and Nominating and Corporate Governance Committees. Defendant Jennings knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2003, Jennings held 102,523 options to purchase Aspen stock.

24. Defendant Michael Pehl ("Pehl") has served on the Board since August 2003. Defendant Pehl knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and

committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2003, Pehl held 1,527,003 options to purchase Aspen stock.

25. Defendant Stephen L. Brown ("S. Brown") served on the Board from July 2000 until 2003. During that time, he served on the Audit, Compensation, and Nominating and Corporate Governance Committees. Defendant Brown knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2003, S. Brown held 53,523 options to purchase Aspen stock.

26. Defendant Gresham T. Brebach, Jr. (Brebach") served on the Board from 1995 until 2003. During that time, he served on the board's Audit and Compensation Committees. Defendant Brebach knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2003, Brebach held 102,523 options to purchase Aspen stock.

27. Defendant Douglas R. Brown ("D. Brown") served on the Board from 1986 until 2002. During that time, he served on the Audit, Compensation, and Nominating and Corporate Governance Committees. Defendant Brown knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of

Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2003, D. Brown held 102,523 options to purchase Aspen stock.

28. McArdle, Casey, Fusco, Haroian, Jennings, Pehl, Kingsley, S. Brown, Brebach and D. Brown are sometimes referred to herein as the "Director Defendants."

**Officer Defendants**

29. Defendant Charles F. Kane ("Kane") was Aspen's Senior Vice President, Finance and Chief Financial Officer ("CFO") from July 2003 until September 2006. Kane knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Kane is believed to have received at least 189,216 backdated options from Aspen.[1]

30. Defendant Manolis E. Kotzabasakis ("Kotzabasakis") has been with Aspen since at least 1997 and is currently the Company's Senior Vice President, Sales and Business Development. Kotzabasakis knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other

---

[1] These option numbers, and others included in this complaint are based only on Defendants' publicly reported statements regarding option grants. Plaintiff believes that discovery might reveal that Aspen has granted unreported stock options to other potential executive officer defendants, and that the options granted to the named Defendants may be larger than reported.

10

corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Kotzabasakis is believed to have received at least 37,547 backdated options from Aspen.

31. Defendant C. Steven Pringle ("Pringle") has been with Aspen since at least July 2002 and is currently the Company's Senior Vice President, Global Services. Pringle knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Pringle is believed to have received at least 335,727 backdated options from Aspen.

32. Defendant David McQuillin ("McQuillin") joined Aspen in 1997 and was the Company's President and CEO from October 2002 until January 2005. He also served on the Board from October 2002 until January 2005. McQuillin knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, McQuillin is believed to have received at least 1,880,000 backdated options from Aspen.

33. Defendant Lawrence B. Evans ("Evans") was Aspen's principal founder and served on the Board from 1981 until 2004. Evans was the Chairman of the Board from 1984

until 2004, the Company's President from 1984 through 2001, and its CEO from 1984 through 2002. Evans knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Evans is believed to have received at least 251,652 backdated options from Aspen.

34. Defendant Stephen J. Doyle ("Doyle") joined Aspen as early as 1996 and was the Company's General Counsel and Secretary from May 2002 until July 2005. Doyle knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Doyle is believed to have received at least 290,835 backdated options from Aspen.

35. Defendant Lisa W. Zappala ("Zappala") joined Aspen as early as 1995 and was the Company's Senior Vice President, Finance in 2003. She also served as the Company's Chief Financial Officer ("CFO") from September 1998 through June 2003. Zappala knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof

and via reports and other information provided to him in connection therewith. Since 1997, Zappala is believed to have received at least 45,704 backdated options from Aspen.

36. Defendant Mary A. Palermo ("Palermo") joined Aspen in 1987. Palermo served as the Company's Co-Chief Operating Officer from January 2001 until 2003. Palermo knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Palermo is believed to have received at least 164,726 backdated options from Aspen.

37. Kane, Kotsabaskis, Pringle, McQuillin, Evans, Doyle, Zappal, and Palermo are sometimes referred to herein as the "Officer Defendants."

38. Collectively, Defendants McArdle, Kingsley, Casey, Fusco, Haroian, Jennings, Pehl, Steven Brown, Brebach, Douglas Brown, Kane, Kotzabaskis, Pringle, McQuillin, Evans, Doyle, Zappala, and Palermo are sometimes referred to herein as the "D&O Defendants."

### Duties Of The D&O Defendants

39. By reason of their positions as directors, and with regard to some, officers, and/or fiduciaries of Aspen, the D&O Defendants owed Aspen and its shareholders fiduciary obligations of trust, loyalty, due care, good faith, and fair dealing and were and are required to use their utmost ability to control Aspen in a fair, just, honest and equitable manner.

40. Each director and officer of the Company owes to Aspen and its shareholders the fiduciary duty to exercise due care and good faith and diligence in the administration of the Company's affairs, and the highest obligations of fair dealing. In addition, as directors of a

publicly held company, the D&O Defendants had a duty to insure that the Company had sufficient internal controls to ensure that it promptly disseminated accurate and truthful information with regard to the Company's financial results, and that the Company had adequate corporate checks to protect against the unlawful back-dating of options and the improper accounting for those options, as described below.

41. To discharge their duties, the D&O Defendants were required to exercise reasonable and prudent supervision over management, and the Company's policies, practices and financial controls. By virtue of such duties, the D&O Defendants were required to, among other things:

(a) Ensure that an adequate system of internal controls was in place such that Aspen complied with applicable laws and financial results were reported accurately;

(b) Ensure that the Company had adequate corporate checks in place to ensure the Company was in compliance with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c) Ensure that management was conducting the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock; and

(d) Remain informed as to how Aspen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws.

42. The conduct of the Individual Defendants complained of herein involves a reckless and/or knowing violation of their obligations as directors and officers of Aspen, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the D&O Defendants were aware or should have been aware posed a risk of serious injury to the Company.

43. The D&O Defendants breached their fiduciary duties by failing to implement an adequate system of internal controls, which failure caused the Company to misrepresent its financial condition and allowed the unlawful back-dating of options.

44. During all times relevant hereto, the D&O Defendants breached their fiduciary duties to Aspen's shareholders by failing to prevent financial statements from being issued that misrepresented to the investing public, including shareholders of Aspen, the Company's actual financial results.

45. Moreover, these actions have irreparably damaged Aspen's corporate image and goodwill. For at least the foreseeable future, Aspen will suffer from what is known as the "liar's discount," a term applied to the stocks of companies implicated in illegal behavior and that misled the investing public, such that Aspen's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**BACKGROUND**

46. Stock options give recipients the chance to purchase a corporation's common stock at a certain price, which is usually referred to as the "exercise price" or the "strike price." Generally, and for reasons largely related to applicable Internal Revenue Service ("IRS") rules (as discussed below), option exercise prices are usually set on the date of the grant and they are established based on the corporation's closing stock price on the date of the grant.

47. Generally, the theory is that the recipient of any option grant is assuming the risk in receiving the grant; that is, if the corporation's stock price declines after the date of the grant, those options (at least in the short term) do not have any true economic value because the recipient of the grant can purchase the corporation's common stock in the open market at a price that is lower than the strike price on the option. Sometimes, these options are (colloquially) said to be "underwater" because they are not "in-the-money" and thus, there is no rationale economic reason to exercise the option if the corporation's stock price declines after the date of the grant.

48. Conversely, if a corporation's stock price increases after the date of a grant, the recipient of the grant has received a valuable economic benefit - the recipient can then exercise the option, which allows him/her to purchase stock below market price which he/she can then sell into the market for a profit.

49. In 2005, the SEC began investigating the stock option granting practices of numerous companies. As reported by the *Wall Street Journal* on March 18, 2006, the SEC's "look at options timing was largely prompted by academic research that examined thousands of companies and found odd patterns of stock movement around the dates of the grants."

50. The premise of the academic research was that mere chance could not have accounted for many of the fortuitous reported grant dates and a pattern emerged – at certain companies, executives, consistently, over a multi-year period, received options that were purportedly dated at or near historical low trading prices of their companies' stock, but just prior to material increases in the stock price. The academics' conclusion, which was based on a sophisticated statistical analysis, was that option grant dates were manipulated (i.e., backdated) at many companies they examined.

51. Generally, the theory is that these improper backdating practices allowed corporate insiders to reap unlawful windfall profits when the options were exercised. It stands to reason – if an executive was allowed to pick a grant date (instead of sticking with whatever date the options were actually granted), he/she could pick a date when the corporation's stock price was low, thereby earning "extra," but illicit profits.

52. In its March 18 story, the *Wall Street Journal*, employing a sophisticated financial analysis that was built on the academics' research, identified a number of corporate insiders who appeared to be the worst offenders. Thus, the *Wall Street Journal* speculated that these officers, among many others, had received backdated options.

53. Between at least 1996 and 2006, Aspen, through the actions of the Board and its Compensation Committee, granted backdated stock options for the purchase of millions of shares of the Company's common stock to Defendants who were highly placed executives with the Company.

54. In its public filings with the SEC, including in the proxy statements seeking shareholder approval for the stock options plans, Aspen contracted and represented that the exercise price of all of the stock options granted would be fixed based on the fair market value of the Company's common stock on the date of the grant.

**Contracts and Disclosures Regarding the Stock Option Plans**

55. In 1995, Aspen created a series of shareholder-approved stock option plans. The first, known as The Aspen Technology, Inc. 1995 Employee Stock Purchase Plan (the "1995 Plan") was created to "encourage ownership of Stock by employees of the Company and to provide additional incentive for the employees to promote the success of the business of the Company."

17

56. Amended in 2003, the 1995 Plan provides in relevant part:

> The Plan shall be administered by the Committee, which shall determine from time to time whether to grant Options under the Plan, shall specify which dates shall be Grant Dates and Exercise Dates, shall determine the fair market value of the Stock, and shall fix the maximum percentage of each Optionee's Compensation which may be withheld for the purpose of purchasing shares of Stock; PROVIDED, that, the maximum percentage shall not exceed five percent. The Committee shall have authority to interpret the Plan, to prescribe, amend and rescind rules and regulations relating to the Plan, to determine the terms of Options granted under the Plan, and to make all other determinations necessary or advisable for the administration of the Plan.

57. "Committee" is defined in the Plan as "a committee of the board of directors of the Company composed exclusively of disinterested directors."

58. The 1995 Plan also provides that "[t]he purchase price of shares of Stock shall be 85 % of the lesser of (a) the Market Value of the shares as of the Grant Date, or (b) the Market Value of the shares as of the Exercise Date, or such greater percentage as may be set by the Committee from time to time."

59. During the Relevant Period, Aspen also had a shareholder-approved stock option plan for Directors, known as the 1995 Directors Stock Option Plan ("1995 Directors Plan"). The 1995 Directors Plan was created to "encourage ownership of the Stock by non-employee directors of the Company and to provide additional incentive for them to promote the success of the Company's business."

60. The 1995 Director's Plan provided for option grants to non-employee directors as follows:

> FIRST GRANTS TO CERTAIN DIRECTORS. Each individual who was not, within the 12 months preceding his or her first election to the Board of Directors, either an officer or employee of the Company or any subsidiary of the Company and who is serving as a director immediately after the 1995 Annual Meeting of Stockholders or who is first elected to the Board of Directors during the term of the Plan (whether elected at an

annual or special stockholders' meeting or by action of the Board of Directors) shall be granted, on the date of the 1995 Annual Meeting or such later election an Option to purchase 12,000 shares of Stock. Each Option shall (i) have an exercise price equal to 100% of the Fair Market Value of the Stock on the Grant Date, and (ii) become exercisable in 12 quarterly installments, beginning with the last day of the calendar quarter following the Grant Date, but only if the Optionee remains a director of the Company on the respective dates. The Option Period shall be ten years from the Grant Date.

SUBSEQUENT GRANTS TO CERTAIN DIRECTORS. Each individual who continues as a non-employee director following any Annual Meeting of Stockholders of the Company shall be granted, on the date of that Annual Meeting of Stockholders, an Option to purchase 4,000 shares of Stock. Each Option shall (i) have an Exercise Price equal to 100% of the Fair Market Value of the Stock on the Grant Date and (ii) become exercisable in four quarterly installments, beginning with the third anniversary of the Grant Date, but only if the Optionee remains a director of the Company on the respective dates. The Option Period shall be ten years from the Grant Date.

61. At some point after the adoption of the 1995 Directors Plan, the plan was amended to increase the amount of the initial grants to directors from 12,000 to 24,000 options, and to increase subsequent annual grants from 4,000 to 8,000 options.

62. In 1995, Aspen also created a stock option incentive plan known simply as the 1995 Stock Option Plan ("1995 Incentive Plan"). With the stated purpose of "encourage[ing] ownership of the Stock by key employees and key advisors of the Company and its Related Corporations and to provide additional incentive for them to promote the success of the Company's business," this Plan was to be administered according to the following guidelines:

The Plan shall be administered by the Committee. Subject to the provisions of the Plan, the Committee shall have complete authority, in its discretion, to make the following determinations with respect to each Option to be granted by the Company: (a) the key employee or key advisor to receive the Option; (b) the time of granting the Option; (c) the number of shares subject thereto; (d) the Option Price; (e) the Option period; and (f) if the Optionee is an employee, whether the Option is an Incentive Option. In making such determinations, the Committee may take into account the nature of the services rendered by the key employees and key advisors, their present and potential contributions to the success of the

19

Company and its Related Corporations, and such other factors as the Committee in its discretion shall deem relevant. Subject to the provisions of the Plan, the Committee shall also have complete authority to interpret the Plan, to prescribe, amend and rescind rules and regulations relating to it, to determine the terms and provisions of the respective Option Agreements (which need not be identical), and to make all other determinations necessary or advisable for the administration of the Plan. The Committee's determinations on the matters referred to in this Section 5 shall be conclusive.

63. The 1995 Incentive Plan defined "Committee" as "[t]he Compensation Committee of the Company's Board of Directors."

64. Regarding option pricing, the Plan provided, "[t]he Option Price under each Incentive Option shall be not less than 100% of the Fair Market Value of the Stock on the Grant Date except that the Option Price under an Incentive Option granted to a Major Shareholder must be not less than 110% of the Fair Market Value."

65. The Company also has three additional stock option plans to benefit the Company's employees: the 1996 Special Stock Option Plan; the 1998 Employee Stock Purchase Plan, and the 2001 Stock Option Plan. Each of these plans were also administered by the Compensation Committee and the strike price there under was purportedly set at the fair market value of Aspen stock on the date of the grant.

### Executive Officers' Receipt of Back-Dated Stock Options

66. According to an article published in the Wall Street Journal on May 18, 2006, on or about May 16, 2006, an accounting research firm, the Center for Financial Research and Analysis ("CFRA"), issued a report that examined stock option grants in 100 companies that issued a high proportion of stock option grants relative to its executive compensation. The study identified companies that were at risk for manipulating the timing based upon the grant of